# EXHIBIT A

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
3/4/2026 4:14 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026CH02082
Calendar, 13
36945775

|  |  |
|---|---|
| AARON BERRY, individually and on behalf of those similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>UNIVERSITY OF ILLINOIS HOSPITAL & HEALTH SCIENCES SYSTEM, AND EPIC SYSTEMS CORPORATION,<br><br>    Defendants. | Case No. **2026CH02082** |

## CLASS ACTION COMPLAINT

Plaintiff Aaron Berry ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendants University of Illinois Hospital & Health Sciences System ("UI Health Defendant") and Epic Systems Corporation ("Epic Defendant"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions and his counsel's investigation, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1. This class action arises out of a recent data breach ("Data Breach") involving Defendants University of Illinois Hospital & Health Sciences System ("UI Health") and Epic Systems Corporation ("Epic") (collectively "Defendants"), healthcare entities involved in the provision of medical services and electronic health record systems. At all relevant times, Epic provided electronic health record technology and related interoperability services used by UI Health in connection with healthcare-related operations that required the collection, use, storage, and transmission of sensitive patient information.

2. Plaintiff brings this Complaint against Defendants for their failure to properly secure and safeguard the personally identifiable and health information that they collected,

1

received, maintained, transmitted, and/or controlled as part of their regular business practices, including Plaintiff's and Class Members' sensitive medical and health information, including orders, procedures, consultations, emergency department visits, laboratory results, treatment information, and other related health information (collectively defined herein as "Private Information").

3. Upon information and belief, Plaintiff and Class Members were required to entrust Defendants with sensitive, non-public Private Information in connection with healthcare services provided by and/or through Defendants, without which Defendants could not perform their regular business activities. Defendants retained this information for many years, including after the healthcare relationship ended.

4. By obtaining, collecting, using, storing, transmitting, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to protect and safeguard that information from unauthorized access and misuse.

5. Defendants failed to adequately protect Plaintiff's and Class Members' Private Information and failed to implement reasonable safeguards governing how patient information could be accessed through their electronic systems and health information exchange networks. As a result, Plaintiff's and Class Members' Private Information was accessed by entities that were not authorized to obtain that information for legitimate treatment purposes. The present and continuing risk of misuse of sensitive personal and health information to victims of the Data Breach will persist for years.

6. By breaching their duties to properly safeguard Plaintiff's and Class Members' Private Information and to provide timely and adequate notice of the Data Breach, Defendants engaged in negligent and/or reckless conduct and violated applicable federal and state statutes.

2

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

7.      Plaintiff brings this action on behalf of all persons whose Private Information was accessed or compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security and oversight practices; and (iii) effectively secure and monitor systems and networks containing protected Private Information using reasonable and effective safeguards free of vulnerabilities and misuse. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

8.      Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to safeguard Private Information, failing to take available steps to prevent unauthorized access and misuse, and failing to follow applicable protocols, policies, and procedures regarding data security, privacy, and access governance. As a result, Plaintiff's and Class Members' Private Information was accessed by unauthorized entities. Plaintiff and Class Members have a continuing interest in ensuring that their information remains secure and are entitled to injunctive and equitable relief.

9.      Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) unauthorized access to their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which remains maintained within Defendants' systems

3

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

and subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

10.     Plaintiff seeks to remedy these harms and prevent any future unauthorized access to patient information on behalf of himself and all similarly situated persons whose personal and health data was compromised as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security and oversight practices.

## PARTIES

11.     Plaintiff Aaron Berry is a natural person and resident and citizen of Chicago, Illinois.

12.     Defendant University of Illinois Hospital & Health Sciences System is a healthcare system that is based in and/or operates in the State of Illinois with its principal place of business in Chicago, Illinois.

13.     Defendant Epic Systems Corporation is a corporation that provides electronic health record systems and related healthcare technology services and maintains its principal place of business in Verona, Wisconsin.

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over this action under Illinois Constitution Article VI, § 9.

15.     This Court has general personal jurisdiction over Defendant under 735 ILCS § 5/2-209 because it is at home in this County.

16.     Venue is proper in this Court under 735 ILCS § 5/2-101(2) because Defendant resides in this County and the transactions or some part thereof out of which the claims arose occurred in this County.

4

**FACTUAL ALLEGATIONS**

*Background of Defendants.*

17. University of Illinois Hospital & Health Sciences System ("UI Health") is a healthcare system based in and/or operating in the State of Illinois.[1] UI Health provides medical services through the University of Illinois Hospital & Clinics and other affiliated clinical sites.[2]

18. Epic Systems Corporation ("Epic") is a healthcare software company that develops and provides electronic health record ("EHR") and related healthcare technology systems, including the Epic electronic health record system used by UI Health.[3]

19. UI Health utilizes the Epic electronic health record system and participates in a national information sharing network known as Carequality. Carequality is an interoperability framework enabling nationwide care coordination and the exchange of health information among health care providers.[4]

20. In the ordinary course of their business, Defendants receive, collect, store, and maintain the Private Information, including personally identifiable information ("PII") and protected health information ("PHI"), of patients, including Plaintiff and Class Members.

21. Defendants solicit, collect, use, and derive a benefit from Plaintiff's and Class Members' Private Information.

---

[1] *See* About UI Health, University of Illinois Hospital & Health Sciences System, https://hospital.uillinois.edu/about-ui-health (last visited Mar. 4, 2026).
[2] *See* Healthcare Services, UI Health, https://uihealth.uic.edu/healthcare/ (last visited Mar. 4, 2026).
[3] *See* Epic Systems Corporation, Epic, https://www.epic.com/ (last visited Mar. 4, 2026),
[4] *See* About Epic, UI Health, https://hospital.uillinois.edu/patients-and-visitors/patient-information/mychart/about-epic (last visited Mar. 4, 2026).

FILED DATE: 3/4/2026 4:14 PM    2026CH02082

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

22. Defendants use the Private Information they collect and store to provide healthcare services, electronic health record functions, health information exchange, and billing, and to generate revenue therefrom.

23. Defendants would be unable to engage in their regular business activities without collecting and aggregating Private Information that they know and understand to be sensitive and confidential.

24. Plaintiff and Class Members, as patients of UI Health and users of healthcare services provided by and/or through UI Health utilizing Epic's electronic health record system and related information sharing functions, paid for medical services that necessarily included the collection, use, and storage of their Private Information. As part of these services, Defendants promised to protect the confidentiality and security of patient information, and a portion of these payments was intended to support data security and compliance obligations.

25. By obtaining, collecting, using, storing, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting that information from unauthorized disclosure.

26. Defendants recognized their duty to safeguard patient information and publicly represented that they comply with healthcare privacy and confidentiality requirements governing the use and protection of PHI and other sensitive patient data.

27. Contrary to these representations, Defendants failed to implement and maintain adequate data security measures to protect Plaintiff's and Class Members' Private Information, resulting in a data breach that compromised the Private Information of numerous individuals.

28. Defendants owed a duty to protect Plaintiff and Class Members from the harm caused by insufficient data security and the foreseeable exposure of their Private Information, as such harm was reasonably foreseeable and preventable.

29. Defendants' duty obligated them to implement reasonable data protection practices, including securing Private Information against unauthorized access, limiting its use and disclosure to authorized purposes, deleting information when no longer necessary for legitimate business purposes, and training employees on cybersecurity risks and safeguards.

30. At the time of the Data Breach, Defendants maintained unencrypted and/or inadequately protected Private Information of Plaintiff and Class Members on their network systems.

31. Defendants negligently failed to secure Plaintiff's and Class Members' Private Information and failed to ensure that adequate safeguards were in place to protect that information from unauthorized access and disclosure.

***The Data Breach.***

32. Upon information and belief, beginning in or about January 2026, Defendants discovered that certain requests for health information made through the Carequality network appeared to be unrelated to treatment and resulted in the potential unauthorized access to sensitive patient information maintained within systems utilized by Defendants.[5]

33. At the time of the incident, Defendants' systems contained unencrypted and inadequately protected Private Information of Plaintiff and Class Members, including personally identifiable information and protected health information.

---

[5] *See* Defendant's Notice of Data Security Incident, attached hereto as **Exhibit A.**

7

34.     Upon information and belief, UI Health maintained the Private Information of patients who received medical care through its facilities using the Epic electronic health record system and related health information exchange networks, including Plaintiff and Class Members.

35.     On or about February 12, 2026, UI Health issued a written notification informing affected individuals that certain requests for health information made through the Carequality network were determined to be unrelated to treatment purposes.[6]

36.     According to the notice, on January 13, 2026, Epic notified UI Health that certain requests for health information made through the Carequality network appeared to be unrelated to treatment.[7]

37.     Following several months of investigation and review by the Carequality Dispute Resolution Governing Board, it was determined that certain Carequality participants did not comply with Carequality rules and sought information for purposes other than treatment.

38.     The entities identified as having improperly accessed or requested health information included RavillaMed, Mammoth Path Solutions Dx, SelfRx, and GuardDog Telehealth.

39.     As a result of these findings, Carequality suspended network connectivity with the identified participants.

40.     The information potentially accessed included clinical and administrative data such as orders, office visits, procedures, consultations, emergency department visits, laboratory results, treatment information, and other related health information.

---

[6] *See* Ex. A, Notice.
[7] *Id*.

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

41.   Defendants have failed to disclose critical facts surrounding the Data Breach, including the full scope of the unauthorized access, the specific vulnerabilities that permitted the improper access to occur, the number of individuals affected, the duration of the unauthorized access, and the steps taken to prevent a recurrence.

42.   This lack of disclosure deprives Plaintiff and Class Members of information necessary to assess the risks posed by the Data Breach and to take appropriate steps to mitigate the ongoing and future harms associated with the exposure of their Private Information.

43.   Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information they maintained for Plaintiff and Class Members, including implementing safeguards to ensure that health information exchanged through network systems was requested and accessed only for authorized treatment purposes.

44.   As a result of Defendants' failures, unauthorized third parties were able to access or obtain files containing Plaintiff's and Class Members' Private Information, including sensitive medical and health information associated with their care.

45.   Plaintiff further believes that his Private Information and that of Class Members has been and will continue to be distributed, sold, or otherwise misused by unauthorized parties, which is consistent with the risks associated with unauthorized access to sensitive healthcare information systems.

### *Data Breaches Are Preventable.*

46.   Defendants could have prevented the Data Breach by, among other things, properly encrypting or otherwise securing their systems, servers, and computer files containing Plaintiff's and Class Members' Private Information.

9

47.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[8]

48.     To prevent and detect cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

---

[8] How to Protect Your Networks from RANSOMWARE 3, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Mar. 4, 2026).

10

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[9]

49. To prevent and detect cyber-attacks or data theft, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

---

[9] *Id.* at 3-4.

11

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[10]

50. Given that Defendants collected, stored, processed, and transmitted highly sensitive Private Information, Defendants could and should have implemented reasonable technical, administrative, and physical safeguards designed to prevent and detect this kind of unauthorized access.

51. The occurrence of the Data Breach itself indicates that Defendants failed to adequately implement one or more reasonable security measures, resulting in unauthorized access to and exfiltration of Private Information belonging to Plaintiff and Class Members.

52. As healthcare entities entrusted with sensitive patient data, Defendants were required to comply with industry-standard cybersecurity practices and to anticipate the risk of data theft attacks targeting healthcare organizations.

### Defendants Acquire, Collect, and Store Plaintiff's and Class Members' Private Information

53. In connection with the healthcare services Defendants provided, Plaintiff and Class Members were required to provide their sensitive and confidential Private Information to Defendants.

54. UI Health collected and maintained Plaintiff's and Class Members' Private Information in connection with the provision of medical care and maintained such information within electronic health record systems utilized to document patient treatment, clinical encounters,

---

[10] *See Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Mar. 4, 2026).

12

and related healthcare services.

55. Epic provided the electronic health record platform and related technology systems used by UI Health to collect, store, process, and transmit Plaintiff's and Class Members' Private Information as part of the provision of healthcare services.

56. Defendants collected, received, stored, and processed Plaintiff's and Class Members' Private Information in connection with the provision of healthcare services, the maintenance of electronic health records, and the exchange of health information through network systems used for clinical and administrative purposes.

57. Defendants retained and stored this Private Information and derived substantial economic benefit from its collection and use. Without collecting and aggregating Plaintiff's and Class Members' Private Information, Defendants would be unable to perform their healthcare services, maintain patient medical records, or facilitate the exchange of clinical information necessary for treatment and administrative functions.

58. By obtaining, collecting, storing, sharing, and using Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting that information from unauthorized disclosure.

59. Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Private Information and reasonably relied on Defendants to keep that information secure, to use it only for authorized healthcare purposes, and to prevent unauthorized disclosures.

60. Defendants could have prevented the Data Breach by properly securing and monitoring the systems and electronic health record networks containing Plaintiff's and Class Members' Private Information and by implementing reasonable safeguards to ensure that health information requests were authorized and made only for legitimate treatment purposes.

***Defendants Both Knew or Should Have Known of the Risk Because Companies in Possession of Private Information are Particularly Susceptible to Cyber Attacks.***

61. Cybercriminals regularly target healthcare entities and their vendors because of the volume and sensitivity of the Private Information they maintain. Defendants knew or should have known that unprotected Private Information is valuable and highly sought after by criminal actors.

62. Defendants' data security obligations were particularly important given the well-documented increase in ransomware and data theft attacks targeting healthcare providers and healthcare-related service entities prior to the Data Breach.

63. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[11] The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points.[12] The 2023 compromises represent a 78 percentage point increase over the previous year and a 72 percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.[13] These numbers held steady in 2024. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year. [14]

64. In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB

---

[11] *See* Identity Theft Resource Center, *2023 Data Breach Annual Report* (Jan. 2024); https://www.idtheftcenter.org/wp-content/uploads/2024/01/ITRC_2023-Annual-Data-Breach-Report.pdf.
[12] *Id.*
[13] *Id*.
[14] *2024 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/.

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

65. Additionally, as companies became more dependent on computer systems to run their business,[15] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[16]

66. As custodians of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members, and of the foreseeable consequences if their information systems and data-sharing networks permitted unauthorized access, including the significant costs imposed on Plaintiff and Class Members as a result of such a breach.

67. Despite widespread public reporting of data breaches and cybersecurity incidents affecting healthcare organizations and health information exchange systems, Defendants failed to take appropriate steps to protect Plaintiff's and Class Members' Private Information from unauthorized access and misuse through the electronic systems and networks they utilized to store and exchange patient data.

68. At all relevant times, Defendants knew or reasonably should have known of the importance of safeguarding Plaintiff's and Class Members' Private Information and of the

---

[15] U.S. Fed. Res., *Implications of Cyber Risk for Financial Stability*, FEDS NOTES (May 12, 2022) https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[16] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PYCUS (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

foreseeable consequences of unauthorized access to that information, including identity theft, fraud, and substantial out-of-pocket costs imposed on affected individuals.

69. Defendants were aware, or should have been aware, of the nature and volume of the Private Information stored within their electronic health record systems and accessible through health information exchange networks, and that unauthorized access through those systems would expose the sensitive information of thousands of patients.

70. The injuries suffered by Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement and maintain reasonable safeguards governing access to Private Information, including adequate monitoring and controls over entities permitted to request and obtain patient information through the systems and networks used by Defendants.

71. The consequences of Defendants' failure to secure Plaintiff's and Class Members' Private Information are ongoing and severe. Once Private Information, particularly sensitive health information, is accessed by unauthorized parties, victims face a heightened and long-term risk of misuse of their personal and medical data.

72. As entities entrusted with Plaintiff's and Class Members' Private Information, Defendants knew or should have known the importance of safeguarding that information and the foreseeable harm that would result from unauthorized access. Nevertheless, Defendants failed to take reasonable steps to prevent the Data Breach

### *Delegation of Healthcare Services and Non-Delegable Data Security Obligations*

73. UI Health utilized the Epic electronic health record system and participated in the Carequality health information exchange network, which enabled other participating healthcare entities to request and obtain patient health information maintained within UI Health's systems for treatment purposes.

16

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

74.     In participating in the Carequality network and enabling interoperability through the Epic electronic health record system, UI Health permitted other network participants to access, request, and receive patient health information maintained within its systems, including the Private Information of Plaintiff and Class Members.

75.     In enabling these information-sharing functions, UI Health retained responsibility for ensuring that patient Private Information accessible through its systems and through network participants was adequately safeguarded against unauthorized access, disclosure, and misuse.

76.     UI Health exercised control over the systems, configurations, and participation in the electronic health record and health information exchange infrastructure through which patient information was made available to network participants.

77.     UI Health knew or should have known that allowing third-party entities participating in a nationwide health information exchange network to access sensitive patient data created cybersecurity and privacy risks and had a duty to implement reasonable oversight, safeguards, auditing, and monitoring to ensure that such participants accessed patient data only for authorized treatment purposes.

78.     Epic designed, developed, and maintained the electronic health record platform and related interoperability functions that enabled the exchange of patient information through the Carequality network and therefore maintained responsibility for implementing reasonable safeguards governing how patient information could be requested, accessed, and transmitted through those systems.

79.     The access to Plaintiff's and Class Members' Private Information occurred through systems and network connections maintained by Defendants and used in connection with their healthcare operations.

17

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

80.     Defendants' failures to implement reasonable oversight, monitoring, and data security safeguards governing access to patient Private Information directly contributed to the Data Breach and the resulting harm to Plaintiff and Class Members.

### *Value of Personally Identifying Information.*

81.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employee-benefit management company or taxpayer identification number."[18]

82.     The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[19] For example, Personal Information can be sold at a price ranging from $40 to $200.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

---

[17] 17 C.F.R. § 248.201 (2013).

[18] *Id.*

[19] Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[20] Ben Luthi, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[21] *In the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Mar. 4, 2026).

83.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—namely, Social Security number.

84.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[22]

85.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

86.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

---

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[23] U.S. Gov't Accountability Office, *Report to Congressional Requesters*, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

19

87. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Defendants Fail to Comply with FTC Guidelines.***

88. The Federal Trade Commission (FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

89. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[24]

90. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[25]

91. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require

---

[24] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[25] *Id.*

20

complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

92.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

93.     These FTC enforcement actions include actions against companies like Defendant.

94.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

95.     Defendants failed to properly implement basic data security practices.

96.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

97.     Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of Plaintiff and Class Members, Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly,

21

FILED DATE: 3/4/2026 4:14 PM  2026CH02082

Defendants' conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### Defendants Fail to Comply with Industry Standards.

98.     As noted above, experts studying cyber security routinely identify companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

99.     Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

100.     Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

101.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02,

22

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

102.   These foregoing frameworks are existing and applicable industry standards for safeguarding data, and upon information and belief, Defendants   failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### *Common Injuries and Damages.*

103.   As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

### *The Data Breach Increases Victims' Risk of Identity Theft.*

23

104. The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

105. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

106. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

107. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

108. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[26]

---

[26] *See* N.C. Gen. Stat. § 132-1.10(1).

24

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

109.  Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[27]

110.  "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup[.]"[28] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[29]

111.  One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[30]

---

[27] *See* Husayn Kassai, *Banks Need to Stop Relying on Social Security Numbers*, BANKTHINK (Nov. 12, 2018), https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers.

[28] *See* Ann Carrns, *Just 5 Banks Prohibit Use of Social Security Numbers* (Mar. 20, 2013), https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers.

[29] *See What Can Someone Do With Your Social Security Number* (Oct. 19, 2023), https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597.

[30] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014),

25

112. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

113. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

114. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiff and the other Class Members.

115. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

116. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud.*

117. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this

---

https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/

26

Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

118.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, freezing their payment cards, contacting credit bureaus to place freezes on their accounts, and monitoring their financial accounts for any indication of fraudulent activity, which may take years to detect. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

119.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[31]

120.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity),

---

[31] *See* U.S. Gov't Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

27

reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[32]

121. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

### *Diminution of Value of Private Information.*

122. Private Information is a valuable property right.[33] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

123. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[34]

124. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[35] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data

---

[32] *See* Fed. Trade Comm'n, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Mar. 4, 2026).

[33] *See* GAO Report, *supra* note 27.

[34] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted). (last visited Mar. 4, 2026).

[35] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, Infosec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market.

broker who in turn aggregates the information and provides it to marketers or app developers.[36,37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[38]

125. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

126. At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

127. The fraudulent activity resulting from the Data Breach may not come to light for years.

128. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[36] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[37] https://datacoup.com/ (last visited Mar. 4, 2026).
[38] https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Mar. 4,, 2026).

FILED DATE: 3/4/2026 4:14 PM 2026CH02082

FILED DATE: 3/4/2026 4:14 PM  2026CH02082

129. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to, upon information and belief, thousands to tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

130. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***Future Costs of Credit and Identity Theft Monitoring is Reasonable and Necessary.***

131. Given the type of targeted attack, the sophisticated criminal activity, and the type of Private Information involved in this case, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

132. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employee-benefit management company of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

133. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

134. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach.

### Loss of Benefit of the Bargain.

135. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide Defendants with their Private Information under certain terms, Plaintiff and Class Members understood and expected that Defendants would properly safeguard and protect their Private Information, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### Plaintiff's Experience

136. Plaintiff was required to provide Defendants with his Private Information in connection with the healthcare services Defendants provide.

137. Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff's Private Information in their systems.

138. Plaintiff is very careful about sharing his sensitive Private Information. Plaintiff stores any documents containing his Private Information in a safe and secure location and takes steps to limit unnecessary disclosure of his personal and health information.

139. Plaintiff provided his Private Information to Defendants and trusted that Defendants would use reasonable measures to protect it according to Defendants' internal policies, including their privacy and data protection policies, as well as state and federal law.

31

140. Plaintiff reasonably understood that in exchange for providing Defendants his Private Information, Defendants would employ adequate cybersecurity and data governance measures and protect his Private Information.

141. Subsequent to receiving notice of the Data Breach, Plaintiff experienced an increase in unsolicited spam calls, text messages, and electronic communications, which Plaintiff reasonably believes may be related to the unauthorized access to his Private Information.

142. Subsequent to the Data Breach, Plaintiff has suffered numerous injuries including, but not limited to: (i) invasion of privacy; (ii) theft or unauthorized exposure of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to monitor and mitigate the consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his Private Information, which: (a) remains available for unauthorized third parties to access and abuse; and (b) remains maintained within Defendants' systems and subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

143. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have not fully informed him of key details about the Data Breach's occurrence and scope.

144. As a result of the Data Breach, Plaintiff anticipates spending time and effort on an ongoing basis to try to monitor and address harms caused by the Data Breach.

145. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of misuse of his Private Information for years to come.

32

146. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains maintained in Defendants' systems, is protected and safeguarded from future breaches or unauthorized access.

147. **CLASS ACTION ALLEGATIONS**

148. Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed class defined as:

> All individuals residing in the United States whose Private Information was compromised in the Data Breach ("Class").

149. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

150. The Class defined above is identifiable through Defendants' business records.

151. Plaintiff reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

152. This action satisfies the numerosity, commonality, typicality, and adequacy requirements under 735 ILCS § 5/2-801(1)-(4):

**Numerosity**: Plaintiff is representative of the proposed Class, consisting of an unknown number of persons. However Plaintiff believes the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein, which are identifiable based on Defendants' records. As such, the Class Members are so numerous that joinder of all members is impracticable.

**Commonality:** Plaintiff's and the Class's claims raise predominantly common fact and

33

FILED DATE: 3/4/2026 4:14 PM    2026CH02082

legal questions that a class wide proceeding can answer for all Class members. Common questions for the Class include, but are not necessarily limited to the following:

  i.    Whether Defendants had a duty to use reasonable care in safeguarding Plaintiff' and the Class's Private Information;

  ii.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

  iii.  Whether Defendants were negligent in maintaining, protecting, and securing Private Information;

  iv.   Whether Defendants breached contractual promises to safeguard Plaintiff' and the Class's Private Information;

  v.    Whether Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

  vi.   Whether Defendants' Data Breach lack of Notice was reasonable;

  vii.  Whether Defendants' conduct was likely to deceive the public;

  viii. Whether Defendants are liable for negligence;

  ix.   Whether Defendants were negligent *per se*;

  x.    Whether Defendants' practices and representations related to the Data Breach breached implied contracts;

  xi.   Whether Defendants were unjustly enriched;

  xii.  Whether the Data Breach caused Plaintiff and the Class injuries and damages;

  xiii. What the proper damages measure is; and

34

xiv. Whether Plaintiff and the Class are entitled to damages, or declaratory and injunctive relief.

**Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

**Appropriateness:** Pursuant to 735 ILCS § 5/2-801(4), this matter is appropriately brought as a class action because of the low likelihood that individuals claims could or would be brought outside of the class context. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

153. Moreover, class certification is appropriate because Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

154. Finally, all members of the proposed Class are readily ascertainable. Defendant has

35

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

access to the names and addresses and/or email addresses of Class Members affected by the Data Breach, as is evident by Defendant's ability to send those individuals notification letters

## CAUSES OF ACTION

### COUNT I
### GROSS NEGLIGENCE AND NEGLIGENCE *PER SE*
**(On Behalf of Plaintiff and the Class)**

155.    Plaintiff incorporates the above allegations as if fully set forth herein.

156.    Plaintiff and Class Members provided their non-public Private Information to Defendants in connection with and as a condition of receiving medical services provided by and/or through Defendants.

157.    Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed or accessed for unauthorized purposes.

158.    By assuming the responsibility to collect, store, maintain, and transmit this data through electronic health record systems and health information exchange networks, Defendants had duties of care to use reasonable means to secure and to prevent unauthorized access to the information and to safeguard the information from misuse.

159.    Defendants had duties to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

160.    Moreover, data collectors in Illinois are required to implement reasonable cybersecurity measures sufficient to protect the data they collect "from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 ILCS § 530/45(a).

161. Defendants' duty to use reasonable security measures also arose under HIPAA as further defined above. These requirements provide a baseline minimum standard of care that healthcare organizations must comply with and are designed to protect patients from the privacy harms associated with the breach of protected health information.

162. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems, networks, and information exchange infrastructure, and the personnel responsible for them, adequately protected the Private Information.

163. Moreover, Defendants had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

164. Defendants had and continue to have duties to adequately disclose that the Private Information of Plaintiff and Class Members within Defendants' possession may have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any misuse of their Private Information by third parties.

165. Defendants breached their duties, pursuant to the FTC Act, HIPAA, 815 ILCS § 530/45(a), and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

37

b. Failing to adequately monitor and govern access to their systems and networks through which patient health information could be requested and obtained by third-party participants;

c. Allowing unauthorized access to Class Members' Private Information through systems and networks maintained and operated by Defendants;

d. Failing to detect in a timely manner that Class Members' Private Information had been accessed or obtained for unauthorized purposes;

e. Failing to implement reasonable oversight and auditing mechanisms governing the entities permitted to request or obtain patient health information through Defendants' systems; and

f. Failing to implement a reasonable cybersecurity and data governance incident response plan that would have enabled Defendants to timely and adequately notify Class Members about the Data Breach's occurrence and scope so they could take appropriate steps to mitigate the potential for identity theft and other damages.

166. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members if such information were improperly accessed or disclosed.

167. Defendants' violation of the FTC Act, HIPAA, and 815 ILCS § 530/45(a) also constitutes negligence per se, as those provisions are designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with unauthorized access to protected health information.

38

FILED DATE: 3/4/2026 4:14 PM  2026CH02082

168. Defendants have acknowledged that Private Information maintained within their systems may have been accessed by entities that were not authorized to obtain that information for legitimate treatment purposes.

169. But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been accessed or compromised.

170. There is a close causal connection between Defendants' failure to implement reasonable safeguards governing access to Private Information and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The Private Information of Plaintiff and Class Members was accessed or disclosed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security and oversight measures.

171. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft or unauthorized disclosure of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which remains subject to unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

FILED DATE: 3/4/2026 4:14 PM    2026CH02082

172.    As a direct and proximate result of Defendants' negligence and negligence per se, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and harm, including but not limited to anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

173.    Additionally, as a direct and proximate result of Defendants' negligence and negligence per se, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains maintained within Defendants' systems and subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

174.    Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

175.    Given Defendants' failures to implement proper safeguards governing access to sensitive patient data, even knowing the ubiquity of privacy risks associated with large-scale health information exchange systems, Defendants' failure to adequately monitor and control access to their systems amounts to gross negligence.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (On Behalf *E* of Plaintiff and the Class)

176.    Plaintiff incorporates the above allegations as if fully set forth herein.

177.    Defendants required Plaintiff and the Class to provide and entrust their Private Information as a condition of receiving medical and healthcare services provided by and/or through Defendants.

178.    Plaintiff and the Class paid money to Defendants in exchange for medical services, as well as Defendants' promises to protect their Private Information from unauthorized disclosure.

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

179.    Defendants implicitly promised to implement reasonable, industry-standard cybersecurity and data governance measures, as well as to comply with HIPAA, and to ensure that Plaintiff's and Class Members' Private Information would remain reasonably protected.

180.    As a condition of receiving medical and healthcare services from UI Health and having their health information maintained and transmitted through Defendants' electronic health record and information exchange systems, Plaintiff and the Class provided and entrusted their Private Information to Defendants. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached, accessed without authorization, or otherwise compromised.

181.    A meeting of the minds occurred, as Plaintiff and Class Members agreed, inter alia, to provide accurate and complete Private Information and to pay Defendants in exchange for Defendants' collective agreement to, inter alia, protect their Private Information. Indeed, no reasonable person would agree to receive medical care from a healthcare provider that admitted it was not prepared to protect protected health information with reasonable security and privacy safeguards.

182.    Plaintiff and Class Members would not have entrusted their Private Information to Defendants in the absence of Defendants' implied promise to adequately safeguard this confidential personal and medical information.

183.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

41

FILED DATE: 3/4/2026 4:14 PM 2026CH02082

184. Defendants breached the implied contracts they made with Plaintiff and the Class by permitting Plaintiff's and Class Members' Private Information to be accessed through their systems by entities that were not authorized to obtain that information for legitimate treatment purposes, by failing to implement reasonable safeguards governing access to patient information through their electronic systems and information-sharing networks, by failing to adequately monitor and control requests for patient information, by failing to adequately safeguard and protect their Private Information, and by failing to provide timely and complete notice regarding the scope and nature of the unauthorized access.

185. Defendants' failure to meet their promises constitutes a breach of the implied contracts.

186. By allowing unauthorized access to Plaintiff's and Class Members' Private Information and failing to safeguard the Private Information maintained within their systems, Defendants breached their contracts with Plaintiff and Class Members.

187. Indeed, Defendants breached their contracts by failing to meet the minimum level of protection required for Plaintiff's and Class Members' protected health information and other Private Information because Defendants did not prevent the Data Breach.

188. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and the Class are now subject to the present and continuing risk of misuse of their Private Information and are suffering, and will continue to suffer, the ongoing, imminent, and impending threat of fraud, misuse of personal and medical information, loss of the confidentiality of their sensitive data, expenses and/or time spent monitoring accounts and communications for

42

signs of misuse, time spent addressing unwanted communications and potential fraud, lost work time, and other economic and non-economic harm.

189. As a result of Defendants' breach of implied contract, Plaintiff and the Class are entitled to and demand actual, consequential, and nominal damages.

## COUNT III
## BREACH OF BAILMENT
### (On Behalf of Plaintiff and the Class)

190. Plaintiff incorporates the above allegations as if fully set forth herein.

191. Plaintiff conveyed his Private Information to Defendants lawfully as a condition of receiving medical services with the understanding that Defendants would retain, safeguard, and ultimately delete or otherwise properly manage his Private Information when it was no longer required for legitimate healthcare or operational purposes.

192. Defendants accepted this Private Information on the implied understanding that Defendants would honor their obligations under federal regulations, state law, and industry standards to safeguard Plaintiff's Private Information and act on the Private Information only within the confines of the purposes for which Defendants collected Plaintiff's Private Information.

193. By accepting Plaintiff's data and storing it on their systems and within their electronic health record and information exchange infrastructure, Defendants had exclusive control over the privacy and security of Plaintiff's data in that Plaintiff had no control over whether Defendants' copies of his protected health information were protected with sufficient safeguards and indeed only Defendants had that control.

194. Defendants maintained and controlled the systems, networks, and information exchange mechanisms through which Plaintiff's Private Information was stored and made accessible to other entities within the healthcare interoperability framework utilized by

43

Defendants.

195. By failing to implement reasonable safeguards governing access to Plaintiff's Private Information, including adequate oversight and monitoring of entities permitted to request and obtain patient data through Defendants' systems and networks, Defendants breached this bailment agreement.

196. Defendants' breach caused harm to Plaintiff in the form of violations of his right to privacy and to self-determination regarding who had and has access to his Private Information, in the form of requiring him to spend time addressing the consequences of Defendants' failures, and in the form of forcing Plaintiff and the Class to face years of substantially increased risk of misuse of their sensitive personal and health information.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

197. Plaintiff re-alleges and incorporates all preceding factual paragraphs as though fully set forth herein.

198. Plaintiff alleges this claim in the alternative to his breach of implied contract claim.

199. Plaintiff and the Class provided their Private Information to Defendants in order to receive healthcare and related medical services.

200. By conferring their Private Information to Defendants, Plaintiff and Class Members reasonably understood that Defendants would be responsible for securing their Private Information from unauthorized access and disclosure.

201. Upon information and belief, Defendants fund their data security and data governance measures entirely from their general revenues, including from money they receive in connection with maintaining and protecting Plaintiff's and Class Members' Private Information.

44

202.     Plaintiff and Class Members paid Defendants and/or their healthcare providers a certain sum of money, which was used, in part, to fund data security measures, including through Defendants' internal systems, electronic health record infrastructure, and network-based information exchange systems.

203.     As such, a portion of the payments made by or on behalf of Plaintiff and the Class was intended to be used to provide a reasonable level of data security, and the amount of the portion of each payment allocated to data security is known to Defendants.

204.     There is a direct nexus between money paid to Defendants and the requirement that Defendants keep Plaintiff's and Class Members' Private Information confidential and protected from unauthorized access and disclosure.

205.     Protecting the Private Information of Plaintiff and Class Members is integral to Defendants' businesses. Without such Private Information, Defendants would be unable to provide the healthcare services and maintain the electronic health records comprising their core operations.

206.     Plaintiff's and Class Members' Private Information has monetary value.

207.     Plaintiff and Class Members directly and indirectly conferred a monetary benefit on Defendants. They indirectly conferred a monetary benefit by purchasing healthcare and related services from Defendants, from which Defendants received compensation that included funds allocated to data security. Plaintiff and Class Members directly conferred a monetary benefit by supplying their Private Information, from which Defendants derive substantial operational and financial benefit and which should have been protected with adequate data security.

208.     Defendants solicited, collected, received, stored, maintained, and transmitted Plaintiff's and Class Members' Private Information and, as such, had direct knowledge of the monetary benefits conferred upon them by Plaintiff and the Class. Defendants profited from these

45

FILED DATE: 3/4/2026 4:14 PM 2026CH02082

transactions and used Plaintiff's and Class Members' Private Information for business purposes.

209. Indeed, Plaintiff and Class Members who were patients of UI Health and whose health information was stored and transmitted through systems maintained and operated by Defendants conferred monetary benefits upon Defendants through payments made directly or indirectly for medical services.

210. Defendants appreciated that a monetary benefit was being conferred upon them by Plaintiff and Class Members and accepted that benefit.

211. Under the facts and circumstances alleged herein, it is inequitable for Defendants to retain those benefits without payment of their value.

212. Defendants enriched themselves by saving costs they reasonably should have expended on reasonable safeguards governing the protection and controlled access of Plaintiff's and Class Members' Private Information.

213. Instead of implementing adequate safeguards governing access to sensitive patient data within their systems and information exchange networks, Defendants increased their own profits at the expense of Plaintiff and Class Members by utilizing insufficient and ineffective security and monitoring measures. Plaintiff and Class Members suffered as a direct and proximate result of Defendants' decision to prioritize operational convenience and cost savings over adequate data protection.

214. Under principles of equity and good conscience, Defendants should not be permitted to retain the monetary benefits belonging to Plaintiff and Class Members because Defendants failed to implement appropriate data management and security measures.

215. Defendants acquired Plaintiff's and Class Members' Private Information through inequitable means by failing to disclose their inadequate data governance and oversight practices,

46

as previously alleged.

216.    If Plaintiff and Class Members had known that Defendants had not adequately secured and governed access to their Private Information, they would not have allowed Defendants to collect that information.

217.    Plaintiff and Class Members have no adequate remedy at law.

218.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injury, including, but not limited to: loss of the opportunity to control how their Private Information is used; the compromise, unauthorized access, and/or misuse of their Private Information; out-of-pocket expenses associated with monitoring and protecting against misuse of their Private Information; lost time and opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; the continued risk to their Private Information, which remains in Defendants' systems and is subject to further unauthorized access so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information; and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

219.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and harm.

220.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, all gains unjustly received.

**COUNT V**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

221.    Plaintiff and the Class re-allege and incorporate all the above allegations.

FILED DATE: 3/4/2026 4:14 PM   2026CH02082

222. Plaintiff and Class Members took reasonable and appropriate steps to keep their Private Information confidential from the public.

223. Plaintiff's and Class Members' efforts to safeguard their own Private Information were successful, as their Private Information was not known to the public prior to the Data Breach.

224. Plaintiff and Class Members had a legitimate expectation of privacy in their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

225. Defendants owed a duty to their patients, including Plaintiff and the proposed Class Members, to keep their Private Information confidential.

226. The unauthorized access to and disclosure of Private Information is highly offensive to any reasonable person.

227. Plaintiff's and Class Members' Private Information is not of legitimate concern to the public.

228. Defendants knew or should have known that Plaintiff's and Class Members' Private Information was private.

229. By intentionally failing to keep Plaintiff's and Class Members' personally identifiable information and protected health information safe, and by permitting and facilitating access to such information by entities that were not authorized to obtain that information for legitimate treatment purposes, Defendants intentionally invaded Plaintiff's and Class Members' privacy by:

230. a. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

48

231.     b. Intentionally disclosing private facts about Plaintiff and Class Members to unauthorized entities, which is highly offensive and objectionable to an ordinary person; and

232.     c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

233.     As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." Id. cmt. B.

234.     Indeed, given the foreseeability of the harms inherent in unauthorized access to large-scale health information systems and the widespread misuse of improperly accessed health data, Defendants were substantially certain that their failure to implement reasonable safeguards governing access to patient information would lead to an invasion of Plaintiff's and Class Members' privacy.

235.     Defendants knew that an ordinary person in Plaintiff's or Class Members' position would consider the exposure of their protected health information and personal data to unauthorized entities to be highly offensive and objectionable.

236.     Defendants invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by permitting the access and disclosure of their personally identifiable information and protected health information without their informed, voluntary, affirmative, and clear consent.

237.     Moreover, given the well-known risks associated with unauthorized access to sensitive personal and medical data, Defendants knew or were substantially certain that their

49

failure to implement reasonable safeguards would lead to the dissemination and misuse of Plaintiff's and the Class Members' Private Information by unauthorized individuals or entities.

238.    The conduct described above was directed at Plaintiff and the Class Members.

239.    As a proximate result of such misuse and disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information were unduly frustrated and thwarted. Defendants' conduct amounted to a substantial and serious invasion of Plaintiff's and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendants' actions or inaction highly offensive and objectionable.

240.    In failing to protect Plaintiff's and Class Members' Private Information and in permitting the unauthorized access and disclosure of that information, Defendants acted in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private. Plaintiff therefore seeks an award of damages on behalf of himself and the Class.

241.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Defendants' inadequate safeguards governing access to patient information will likely result in additional unauthorized access to sensitive data. Plaintiff and Class Members have no adequate remedy at law for the injuries they will sustain because a judgment for monetary damages will not prevent further invasions of Plaintiff's and Class Members' privacy by Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, requests judgment

against Defendants and that the Court grant the following:

A.   For an order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B.   For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C.   For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.   prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.   requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii.   requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v.   prohibiting Defendants from maintaining the Private Information of Plaintiff and Class

51

FILED DATE: 3/4/2026 4:14 PM 2026CH02082

Members on a cloud-based database;

vi. requiring Defendants to engage independent third-party security auditors and penetration testers, as well as internal security personnel, to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

x. requiring Defendants to conduct regular database scanning and security checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities in handling personal identifying information and protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendants to conduct internal training and education routinely and continually, and on an annual basis, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess their employees'

52

FILED DATE: 3/4/2026 4:14 PM    2026CH02082

knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiv.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.   requiring Defendants to meaningfully educate all Class Members about the threats they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of ten (10) years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies in compliance with the Court's final judgment;

D.   For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees and costs as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

53

**JURY TRIAL DEMANDED**

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all claims so triable.

Dated: March 4, 2026

Respectfully Submitted,

*/s/ Colleen Garvey*
Colleen Garvey (ARDC #6337571)
Cook County Attorney No. (100360)
**STRANCH, JENNINGS & GARVEY, PLLC**
701 Market Street, Suite 1510
St. Louis, MO 63101
Tel: (314) 390-6750
cgarvey@stranchlaw.com

Grayson Wells*
Darrius Dixon*
**STRANCH, JENNINGS, & GARVEY, PLLC**
The Freedom Center
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gwells@stranchlaw.com
ddixon@stranchlaw.com

*(*pro hac vice* forthcoming)

*Attorneys for Plaintiff and the Class*

54